ILND 44 (Rev. 09/20)

# CIVIL COVER SHEET

The ILND 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(See instructions on next page of this form.)*

| **I. (a) PLAINTIFFS** | **DEFENDANTS** |
|---|---|
| Jeffery Hood <br> Alissia Hood | Philips North America, LLC; Koninklijke Philips N.V.; <br> Philips Holding USA, Inc.; Philips RS North America, LLC |
| **(b)** County of Residence of First Listed Plaintiff  Will County, Illinois <br> *(Except in U.S. plaintiff cases)* | County of Residence of First Listed Defendant  Massachusetts <br> *(In U.S. plaintiff cases only)* <br> Note:  In land condemnation cases, use the location of the tract of land involved. |
| **(c)** Attorneys *(firm name, address, and telephone number)* <br> Bryan J OConnor [Whiteside & Goldberg, Ltd.] <br> 155 N Michigan Ave., #540; Chicago, IL 60601 [312-334-6875] | Attorneys *(If Known)* |

## II.  BASIS OF JURISDICTION *(Check one box, only.)*

- ☐ 1  U.S. Government <br> Plaintiff
- ☐ 2  U.S. Government <br> Defendant
- ☐ 3  Federal Question <br> *(U.S. Government not a party.)*
- ☑ 4  Diversity <br> *(Indicate citizenship of parties in Item III.)*

## III.  CITIZENSHIP OF PRINCIPAL PARTIES *(For Diversity Cases Only.)*
*(Check one box, only for plaintiff and one box for defendant.)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☑ 1 | ☐ 1 | Incorporated *or* Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☑ 2 | Incorporated *and* Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV.  NATURE OF SUIT *(Check one box, only.)*

| CONTRACT | TORTS | PRISONER PETITIONS | LABOR | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | ☐ 510 Motions to Vacate Sentence | ☐ 710 Fair Labor Standards Act | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 530 General | ☐ 720 Labor/Management Relations | ☐ 376 Qui Tam (31 USC 3729 (a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability <br> ☐ 320 Assault, Libel & Slander <br> ☐ 330 Federal Employers' | **PERSONAL INJURY** <br> ☐ 530 General <br> ☐ 535 Death Penalty | ☐ 740 Railway Labor Act | ☐ 400 State Reapportionment <br> ☐ 410 Antitrust |
| ☐ 140 Negotiable Instrument <br> ☐ 150 Recovery of Overpayment & Enforcement of Judgment <br> ☐ 151 Medicare Act | Liability <br> ☐ 340 Marine <br> ☐ 345 Marine Product Liability <br> ☐ 350 Motor Vehicle <br> ☐ 355 Motor Vehicle Product | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability <br> ☐ 368 Asbestos Personal Injury Product Liability <br> **Habeas Corpus:** <br> ☐ 540 Mandamus & Other <br> ☐ 550 Civil Rights <br> ☐ 555 Prison Condition | ☐ 751 Family and Medical Leave Act <br> ☐ 790 Other Labor Litigation <br> ☐ 791 Employee Retirement Income Security Act | ☐ 430 Banks and Banking <br> ☐ 450 Commerce <br> ☐ 460 Deportation <br> ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loan (Excludes Veterans) <br> ☐ 153 Recovery of Veteran's Benefits <br> ☐ 160 Stockholders' Suits <br> ☐ 190 Other Contract <br> ☐ 195 Contract Product Liability <br> ☐ 196 Franchise | Liability <br> ☐ 360 Other Personal Injury <br> ☐ 362 Personal Injury - Medical Malpractice <br> **PERSONAL PROPERTY** <br> ☐ 370 Other Fraud <br> ☐ 371 Truth in Lending <br> ☐ 380 Other Personal Property Damage <br> ☐ 385 Property Damage Product Liability | ☐ 560 Civil Detainee - Conditions of Confinement | **PROPERTY RIGHTS** <br> ☐ 820 Copyright <br> ☐ 830 Patent <br> ☐ 835 Patent - Abbreviated New Drug Application <br> ☐ 840 Trademark <br> ☐ 880 Defend Trade Secrets Act of 2016 (DTSA) | ☐ 480 Consumer Credit <br> ☐ 485 Telephone Consumer Protection Act (TCPA) <br> ☐ 490 Cable/Sat TV <br> ☐ 850 Securities/Commodities/ Exchange <br> ☐ 890 Other Statutory Actions <br> ☐ 891 Agricultural Arts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **BANKRUPTCY** | **FORFEITURE/PENALTY** | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation <br> ☐ 220 Foreclosure <br> ☐ 230 Rent Lease & Ejectment <br> ☐ 240 Torts to Land <br> ☐ 245 Tort Product Liability <br> ☐ 290 All Other Real Property | ☐ 440 Other Civil Rights <br> ☐ 441 Voting <br> ☐ 442 Employment <br> ☐ 443 Housing/Accommodations <br> ☐ 445 Amer. w/ Disabilities- Employment <br> ☐ 446 Amer. w/Disabilities - Other <br> ☐ 448 Education | ☐ 422 Appeal 28 USC 158 <br> ☐ 423 Withdrawal 28 USC 157 <br> **IMMIGRATION** <br> ☐ 462 Naturalization Application <br> ☐ 463 Habeas Corpus – Alien Detainee (Prisoner Petition) <br> ☐ 465 Other Immigration Actions | ☐ 625 Drug Related Seizure of Property 21 USC 881 <br> ☐ 690 Other <br> **SOCIAL SECURITY** <br> ☐ 861 HIA (1395ff) <br> ☐ 862 Black Lung (923) <br> ☐ 863 DIWC/DIWW (405(g)) <br> ☐ 864 SSID Title XVI <br> ☐ 865 RSI (405(g)) <br> **FEDERAL TAXES** <br> ☐ 870 Taxes (U.S. Plaintiff or Defendant) <br> ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act <br> ☐ 896 Arbitration <br> ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision <br> ☐ 950 Constitutionality of State Statutes |

## V.  ORIGIN *(Check one box, only.)*

- ☑ 1  Original Proceeding
- ☐ 2  Removed from State Court
- ☐ 3  Remanded from Appellate Court
- ☐ 4  Reinstated or Reopened
- ☐ 5  Transferred from Another District (specify)
- ☐ 6  Multidistrict Litigation - Transfer
- ☐ 8  Multidistrict Litigation - Direct File

| **VI.  CAUSE OF ACTION** ( Enter U.S. Civil Statute under which you are filing and write a brief statement of cause.) <br> product liability / negligence claims relating to Philips CPAP | **VII.  PREVIOUS BANKRUPTCY MATTERS** (For nature of suit 422 and 423, enter the case number and judge for any associated bankruptcy matter previously adjudicated by a judge of this Court. Use a separate attachment if necessary.) |
|---|---|

| **VIII. REQUESTED IN COMPLAINT:** | ☐ Check if this is a **class action** under Rule 23, F.R.CV.P. | Demand $ >$75,000.00 | **CHECK Yes only if demanded in complaint:** <br> Jury Demand:  ☑ Yes    ☐ No |
|---|---|---|---|

| **IX.  RELATED CASE(S) IF ANY** *(See instructions):* | Judge | | Case Number |
|---|---|---|---|

**X.   Is this a previously dismissed or remanded case?**   ☐ Yes   ☑ No   If yes, Case #                    Name of Judge

Date:  ARPIL 14, 2022                                                    Signature of Attorney of Record

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JEFFERY HOOD and ALISSIA HOOD, | ) | |
| Plaintiffs | ) | |
| | ) | |
| v. | ) | Case No.: |
| | ) | |
| KONINKELIJKE PHILIPS N.V.; | ) | **PLAINTIFF DEMANDS JURY TRIAL** |
| PHILIPS NORTH AMERICA LLC; | ) | |
| PHILIPS HOLDING USA, INC. | ) | |
| PHILIPS RS NORTH AMERICA LLC | ) | |
| Defendants | ) | |
| | ) | |

## COMPLAINT AT LAW

Plaintiffs JEFFERY HOOD and ALISSIA HOOD, through their attorneys WHITESIDE & GOLDBERG, LTD., submit the following Complaint and Demand for Jury Trial against Defendants Koninklijke Philips N.V. ("Royal Philips"); Philips North America LLC ("Philips NA"); Philips Holding USA, Inc. ("PHUSA"); and Philips RS North America LLC ("Philips RS").

## JURISDICTION & VENUE

1.    This Court has diversity subject matter jurisdiction under 28 U.S.C. §1332 because Plaintiffs and DEFENDANTS are citizens of different states and Plaintiffs' damages exceed $75,000.00.

2.    Venue in the Northern District of Illinois is proper for the following reasons - DEFENDANTS regularly conduct business in this District; Plaintiffs purchased DEFENDANTS' unreasonably dangerous product in this District; JEFFERY HOOD utilized DEFENDANTS' unreasonably dangerous product in this District; and Plaintiffs' injuries and JEFFERY HOOD's resultant medical treatment occurred in this District.

## FACTS APPLICABLE TO ALL COUNTS

3.      Because certain information is outside Plaintiffs' control at the time of filing suit, certain matters are plead in the alternative pursuant to FRCP 8(d).

4.      JEFFERY HOOD (hereinafter JEFFERY) and ALISSIA HOOD (hereinafter ALISSIA) are Will County, Illinois residents.

5.      Defendant Koninklijke Philips N.V. ("Royal Philips") is a public limited liability company established under the laws of The Netherlands, having its principal executive offices at Philips Center, Amstelplein 2, 1096 BC Amsterdam, The Netherlands.

6.      Royal Philips is the parent company of the Philips Group of healthcare technology businesses, including Connected Care businesses focusing on Sleep & Respiratory Care. Royal Philips holds directly or indirectly 100% of its subsidiaries Philips NA and Philips RS. Upon information and belief, Royal Philips controls Philips NA and Philips RS in the manufacturing, selling, distributing, and supplying of the recalled CPAP, Bi-Level PAP, and mechanical ventilator devices.

7.      Defendant Philips North America LLC ("Philips NA") is a Delaware corporation with its principal place of business located at 222 Jacobs Street, Floor 3, Cambridge, Massachusetts 02141. Philips NA is a wholly-owned subsidiary of Royal Philips. Upon information and belief, Philips NA manages the operation of Royal Philips' various lines of business, including Philips RS, in North America. The sole member of Philips NA is PHUSA, which is a Delaware corporation with its principal place of business located at 222 Jacobs Street, Floor 3, Cambridge, Massachusetts 02141.

8.      Defendant Philips Holding USA, Inc. ("PHUSA") is a Delaware corporation with its principal place of business located at 222 Jacobs Street, Floor 3, Cambridge, Massachusetts 02141. PHUSA is a holding company that is the sole member of Defendant Philips NA.

9.      Defendant Philips RS North America LLC ("Philips RS") is a Delaware corporation with its principal place of business located at 6501 Living Place, Pittsburgh, Pennsylvania 15206. Philips RS is a wholly- owned subsidiary of Royal Philips. Philips RS was formerly operated under the business name Respironics, Inc. ("Respironics"). Royal Philips acquired Respironics in 2008.

10.     Royal  Philips, Philips NA, PHUSA, and Philips RS are hereinafter collectively referred to as "PHILIPS" or "DEFENDANTS."

11.     PHILIPS researched, developed, designed, manufactured, imported, sold, distributed, and/or marketed a variety of Continuous Positive Airway Pressure (CPAP) and BiLevel Positive Airway Pressure (BiLevel PAP) devices as well as ventilator devices under its "Sleep & Respiratory Care" portfolio, including the product that is the subject of this litigation, all of which are designed to help patients with sleeping and respiratory conditions, including sleep apnea and OSA.

12.     PHILIPS regularly and systematically transact business in Illinois via researching, developing, designing, manufacturing, selling, distributing, and/or marketing of, amongst other products, BiPAP/CPAP and ventilator devices, including the product that is the subject of this litigation.

13.     PHILIPS researched, developed, designed, manufactured, sold, distributed, and/or marketed its products, including BiPAP/CPAP and ventilator devices and the product that is the subject of this litigation, with the expectation they would be purchased in Illinois.

14.     Regarding the products outlined in paragraphs 11-13, PHILLIPS provides and/or arranges for training and/or instruction in Illinois relating to those products.

15.     Regarding the products outlined in paragraphs 11-13, PHILIPS derives substantial revenue from their business transactions in Illinois and have purposely availed themselves of the privilege of doing business in Illinois.

16.     JEFFERY was prescribed the use one of PHILIPS' recalled devices, a CPAP machine known as Philips System One REMstar Pro C-Flex (hereinafter "the subject device"), to treat his sleep condition.

17.     JEFFERY purchased "the subject device" from a store in Will County, Illinois, and regularly utilized the machine until discovering, in late 2021 or 2022, PHILIPS' recall and his cancer diagnosis.

18.     Regarding "the subject device", JEFFERY utilized it almost exclusively in Illinois.

19.     Prior to discovering, in late 2021 or 2022, PHILIPS' recall and his cancer diagnosis, JEFFERY had no knowledge of the adverse health effects outlined herein.

20.     Under Section 510(k) of the Federal Food, Drug and Cosmetic Act, a medical device does not have to go through the rigors of a clinical study to gain approval by FDA.

21.     Medical devices deemed "substantially equivalent" to devices previously deemed "substantially equivalent" to devices approved for sale by FDA prior to 1976 could be sold to patients in a matter of ninety (90) days without any clinical testing demonstrating the device's efficacy or safety.

22.     Clearance for sale under the 510(k) process does not equate to "FDA approval" of the cleared device.

4

23.     PHILIPS utilized the 510(k)-clearance process for the recalled devices, including "the subject device".

24.     Continuous Positive Airway Pressure ("CPAP") therapy typically involves the use of a hose and a nasal or facemask device that delivers constant and steady air pressure to an individual's throat to help individuals breathe.

25.     Bi-Level Positive Airway Pressure ("BiPAP") therapy involves the use of a nasal or facemask device to maintain air pressure in an individual's airway. Bi-Level PAP devices deliver two alternating levels—inspiratory and expiratory—of pressurized air into a person's airway. nBi-Level PAP devices deliver one level of pressurized air (the inspiratory positive level) to assist as a person inhales, and another level (the expiratory level) as a person exhales.

26.     Mechanical ventilation may be invasive ventilation with a tube inserted into the patient's airway, performed in the intensive care unit in the hospital or a long-term institutional setting. Non-invasive ventilation can be used at home by people with respiratory difficulties.

27.     PHILIPS, in its CPAP, Bi-Level PAP, and ventilator devices including "the subject device", utilized polyester-based polyurethane (PE-PUR) sound abatement foam to dampen device vibration and sound during routine operation and/or for sound abatement purposes.

28.     However, PE-PUR foam can degrade into particles and off-gas certain chemicals.

29.     This process of PE-PUR foam degradation is caused or exacerbated by environmental factors, such as heat, humidity, or moisture.

30.     The particulates and off-gas chemicals resulting from the degradation of PE-PUR foam are toxic and cause both short-term and long-term health risks.

31.     Nevertheless, because of the design of PHILIPS' PAP devices and ventilators, including "the subject device", forced air passes through potentially degraded PE-PUR foam before it is pumped into the patient's airway, thus exposing users to these toxins.

32.     At some point prior to issuing a recall, PHILIPS knew (*and by the beginning of 2011 should have known*) that the type of PE-PUR "sound abatement" foam it used to minimize noise in several CPAP and BiPAP respirators potentially caused adverse health effects to its users. Specifically, PHILIPS knew that "the [PE-PUR] foam may degrade under certain circumstances, influenced by factors including use of unapproved cleaning methods, such as ozone, and certain environmental conditions involving high humidity and temperature."

33.     At some point prior to issuing a recall, PHILIPS knew (*and by the beginning of 2011 should have known*) of potential adverse health effects, including serious and permanent injuries (cancer and death), from exposure to degraded sound abatement foam particles and exposure to chemical emissions from the sound abatement foam material.

34.     At some point prior to issuing a recall, PHILIPS knew (*and by the beginning of 2011 should have known*) of the following -- potential adverse health effects to users related to the sound abatement foam and PE-PUR Foam used in "the subject device", including but not limited to exposure to degraded sound abatement foam particles and exposure to chemical emissions from the sound abatement foam material; knew that the PE-PUR Foam was at risk for degrading into particles that may that may enter the devices' pathway and be ingested or inhaled by users; knew that the PE-PUR Foam may off-gas certain chemicals during operation; knew that there was black debris/particles within the airpath circuit of its devices, extending from the device outlet, humidifier, tubing, and mask; and knew that users reported significant and serious symptomology, including but not limited to headaches, upper airway irritation, cough, chest

pressure, sinus infection, inflammatory response, asthma, adverse effects to other organs (*e.g.*, kidneys and liver) and toxic carcinogenic affects, hypersensitivity, nausea/vomiting, toxic and carcinogenic effects, including lung diseases, cancer and possibly death.

35.     At some point prior to issuing a recall, PHILIPS knew (*and by the beginning of 2011 should have known*) that the degraded foam reveals the presence of potentially harmful chemicals including:

- Toluene Diamine
- Toluene Diisocyanate
- Diethylene glycol.

36.     At some point prior to issuing a recall, PHILIPS knew (*and by the beginning of 2011 should have known*) that lab testing identified the presence of Volatile Organic Compounds (VOCS) which may be emitted from the sound abatement foam component of the affected devices. "VOCs are emitted as gases from the foam included in the [affected devices] and may have short- and long-term adverse health effects. Standard testing identified two compounds of concern may be emitted from the foam that are outside of safety thresholds. The compounds identified are the following:

- Dimethyl Diazine
- Phenol, 2,6-bis (1,1-dimethylethyl)-4-(1-methylpropyl)

37.     DEFENDANTS knew (*and by the beginning of 2011 should have known*) of the degradation of the PE-PUR sound abatement foam used in the Recalled Devices, yet continued to manufacture, market, and sell the Recalled Devices, amassing enormous profit while knowing that users were at increased risk of developing adverse health effects, including cancer and death.

38.     In approximately June 2021, PHILIPS announced a world-wide recall of certain BiPAP and CPAP devices and ventilators, including "the subject device", that incorporated PE-PUR foam and pose life threatening health hazards to users.

39.     The recall notification identified the following devices, including "the subject device", as affected by the recall:

a.    **CPAP and BiPAP Devices:**
Continuous Ventilator, Non-life Supporting
1.     DreamStation ASV;
2.     DreamStation ST, AVAPS;
3.     SystemOne ASV4;
4.     C-Series ASV, S/T, AVAPS;
5.     OmniLab Advanced+;
Non-continuous Ventilator
6.     SystemOne Q series;
7.     DreamStation CPAP, AutoCPAP, BiPAP;
8.     DreamStation Go CPAP, APAP;
9.     Dorma 400, 500 CPAP;
10.    REMStar SE AutoCPAP;
Continuous Ventilator, Minimum Ventilatory Support, Facility Use Device: 11. E30.

b.    **Ventilators:**
Continuous Ventilator
1.     Trilogy 100;
2.     Trilogy 200;
3.     Garbin Plus, Aeris, LifeVent Ventilator;
Continuous Ventilator, Minimum Ventilatory Support, Facility Use
4.     A-Series BiPAP Hybrid A30;
5.     A-Series BiPAP V30 Auto;
Continuous Ventilator, Non-life Supporting
6.     A-Series BiPAP A40; 7.      A-Series BiPAP A30.

40.     At some point prior to issuing a recall, apparently as early as the beginning of 2011, PHILIPS received several complaints regarding the presence of black debris/particles within the airpath circuit (*extending from the device outlet, humidifier, tubing, and mask*)," which a user might ingest or inhale and that lab analysis revealed that even before the particulates appear, the degraded foam may generate harmful chemicals.

41.     At some point prior to issuing a recall, PHILIPS knew (*and by the beginning of 2011 should have known*) that testing confirmed the presence of several harmful organic

compounds, including VOC's, that may off-gas from the degraded foam and cause adverse health effects, including but not limited to irritation and airway inflammation, and this may be particularly important for patients with underlying lung diseases or reduced cardiopulmonary reserve". PHILIPS also knew (*and by the beginning of 2011 should have known*) the degradation proximately causes "headache/dizziness, irritation (eyes, nose, respiratory tract, skin), hypersensitivity, nausea/vomiting, toxic and carcinogenic effects," and may cause "adverse effects to other organs such as kidney and liver."

42.     In approximately July 2021, PHILIPS published an update to health care providers, disclosing that that it had determined from a combination of user reports and lab testing that the degradation of the PE-PUR foam in the recalled devices was caused by "a process called hydrolysis" – i.e., the chemical breakdown of a compound due to a reaction with water. PHILIPS further acknowledged that hydrolysis is the dominant source of degradation for PE-PUR foams, which has been well established in scientific literature for many years, apparently as early as the beginning of 2011.

43.     Regarding the potential adverse health effects outlined herein and which are applicable to "the subject device", PHILIPS knew (*and by the beginning of 2011 should have known*) of such prior to issuing its recall.

44.     At some point prior to issuing a recall, PHILIPS knew (*and by the beginning of 2011 should have known*) about the possibility of PE-PUR foam degradation since it began using this particular foam in its PAP devices.

45.     At some point prior to issuing a recall, PHILIPS knew (*and by the beginning of 2011 should have known*) of the risk that degraded PE-PUR foam could produce toxic and carcinogenic particulates and VOC gas emissions.

46.    At some point prior to issuing a recall, PHILIPS knew (*and by the beginning of 2011 should have known*) of the risk that incorporating PE-PUR foam in the air pathway of "the subject device" could result in users ingesting or inhaling toxic and carcinogenic particulates and VOC gas emissions.

47.    At some point prior to issuing a recall, PHILIPS knew (*and by the beginning of 2011 should have known*) of the risk that degraded PE-PUR foam could produce toxic and carcinogenic particulates and VOC gas emissions, and that incorporating PE-PUR foam in the air pathway of the recalled devices, including "the subject device", could expose users to the risk of ingesting or inhaling toxic and carcinogenic particulates and VOC gas emissions.

48.    An adverse event report from FDA Manufacturer and User Facility Device Experience ("MAUDE") database shows that, as early as 2011, Respironics learned that a patient reported discovering "black dust" on her nose when she awoke the morning after using a RemStar CPAP device and subsequently underwent treatment for "intoxication" and "chest tightness."

49.    Regarding the facts/report outlined in paragraph 48, PHILIPS investigated this report, and confirmed the device contained "evidence of an unknown black substance in the air path and on internal components...present throughout both the intake and exhaust portions of the air path...".  PHILIPS however denied that the presence of the black substance was due to a product defect.

50.    Other consumers have also complained about black particles in PHILIPS' devices several years prior to the 2021 recall, as evidenced by forum posts and statements on internet message boards frequented by OSA patients.

51.     At all times pertinent to this Complaint, DEFENDANTS were the mere alter egos or instrumentalities of each other. There is such a unity of interest and ownership between DEFENDANTS that the separate personalities of their entities ceased to exist. DEFENDANTS operated as a single enterprise, equally controlled each other's business affairs, commingled their assets and funds, disregarded corporate formalities, and used each other as a corporate shield to defeat justice, perpetuate fraud and evade contractual and/or tort liability.

52.     At all times pertinent to this Complaint, DEFENDANTS acted in all respects as agents or apparent agents of one another.

53.     At all times pertinent to this Complaint, DEFENDANTS acted in concert in the designing, manufacturing, marketing, promoting, advertising, and selling of devices for the treatment of obstructive sleep apnea, including the subject device. DEFENDANTS combined their property and labor in a joint undertaking for profit, with rights of mutual control over each other, rendering them jointly liable to Plaintiffs.

54.     Regarding the adverse health effects outlined herein, JEFFERY only recently learned of such hazards, and had no knowledge of such prior to PHILIPS' recall and his cancer diagnosis.

55.     JEFFERY used "the subject device" in accordance with the guidelines, manual, and instructions for use set forth by DEFENDANTS.

56.     JEFFERY used "the subject device" for a purpose for which it was marketed, designed, and intended.

57.     In late 2021, JEFFERY was diagnosed with cancer.

58.     Sometime after the cancer diagnosis and PHILIPS' recall, JEFFERY first learned of DEFENDANTS' wrongful conduct and that "the subject device" may be a proximate cause of his cancer.

59.     The running of any statute of limitations has been equitably tolled by reason of DEFENDANTS fraudulently concealing critical safety information.

60.     Regarding the affirmative acts and representations of DEFENDANTS outlined herein, and specifically those which were done prior to DEFENDANTS issuing its recall and which concern the safety of its products (*including "the subject device"*), DEFENDANTS knew such acts/representations were false; they were deliberately done to deceive users such as JEFFERY; they were deliberately done to prevent users such as JEFFERY from discovering, and/or inquiring about, the products (*including "the subject device"*) potential adverse health effects; they were deliberately done to prevent users such as JEFFERY from discovering potential claims relating to the unreasonably dangerous product and/or DEFENDANTS' wrongful conduct; and JEFFERY relied on DEFENDANTS to disclose any potential adverse health effects relating to "the subject device".

61.     As a proximate result of DEFENDANTS' fraudulent concealment, JEFFERY was unaware, and could not have reasonably known or learned through reasonable diligence, that he was exposed to the adverse health effects set forth herein, which were proximately caused by DEFENDANTS' wrongful conduct and its unreasonably dangerous "subject device".

62.     As a proximate result of DEFENDANTS' fraudulent concealment, JEFFERY was prevented from discovering potential adverse health effects related to "the subject device", and as a further proximate was prevented from discovering potential claims relating to the unreasonably dangerous product and/or DEFENDANTS' wrongful conduct.

12

63.     Had DEFENDANTS not fraudulently concealed the potential adverse health effects related to "the subject device", JEFFERY would have discovered such and/or would have consulted with physician or health care provider about such hazards, and after being advised of such, would have ceased using "the subject device", thereby likely mitigating some of the injuries which proximately resulted from PHILIPS' wrongful conduct and "the subject device".

**COUNT I**
*Strict Product Liability (Manufacturing Defect; Design Defect; Failing to Warn)*

64.     DEFENDANTS had a nondelegable duty to research, develop, design, produce, manufacturer, sell, distribute and market "the subject device" such that it was reasonably safe for all intended and foreseeable uses.

65.     DEFENDANTS had a duty to properly warn about potential adverse health effects relating to "the subject device" of which it knew or should have known at the time the product left its control.

66.     "The subject device" was unreasonably dangerous because of at least one of the following:

    a  DEFENDANTS manufactured, incorporated, and/or designed the PE-PUR foam in such manner to expose the user to the ingestion or inhalation of degraded PE-PUR foam particulates or chemical emissions.

    b  The PE-PUR foam incorporated in the devices may break down and release toxic particles or chemical emissions into a device's air pathway, which a user may ingest or inhale.

    c  The PE-PUR foam comprising part of the devices can degrade into particles that enter the devices' air pathway and can off-gas certain chemicals.

    d  The PE-PUR foam contains harmful chemicals including Toluene Diamine, Toluene Diisocyanate, and Diethylene Glycol.

    e   DEFENDANTS manufactured and/or designed "the subject device" in such manner that it proximately causes potentially hazardous black debris/particles within the airpath circuits of its devices.

    f   The PE-PUR foam degradation is proximately caused or exacerbated by environmental factors such as heat, humidity, or moisture, which will foreseeably and/or inevitably occur at some point during ordinary use of the product.

    g   DEFENDANTS manufactured and/or designed "the subject device" in such manner that forced air must be passed-through potentially degraded PE-PUR foam before it is pumped into the patient's airway, thus exposing users to potential toxins.

    h   Failed to utilize polyether urethane (PEUR) or silicone-based foam.

    i   DEFENDANTS manufactured and/or designed "the subject device" in such manner that the PE-PUR foam degradation is proximately caused or exacerbated by a process called hydrolysis (i.e. reaction with water), which potentially occurs during ordinary use (lifetime) of the product.

    j   Failed to properly warn of the potential adverse effects outlined herein when it knew (or should have known) of such.

    k   Failed to properly warn of the risks of harm resulting from exposure to degraded PE-PUR foam, its particulates and chemical emissions as a result of using "the subject device", when it knew or should have known of such potential hazards.

67.    The conditions outlined above existed in "the subject device" at the time it left DEFENDANTS' control.

68.    Separate from paragraph 66, there existed in "the subject device", at the time it left DEFENDANTS' control, certain non-specific defects which made it unreasonably dangerous because it did not perform in the manner reasonably to be expected in light of its nature and intended function.

69.    At all relevant times, JEFFREY used the product in the normal manner, and there is no other reasonable cause of "the subject device's" failure to perform other than a product defect.

70.     As a proximate result of DEFENDANTS' breaches of duty and the unreasonably dangerous "subject device", JEFFREY sustained serious and permanent injuries, including cancer, and as a further proximate result incurred economic and non-economic damages, including past & future pain & suffering, past & future disfigurement, past & future disability, past & future loss of normal life, past & future loss of earnings (*loss of earnings opportunities & potential*), past & future loss of health/welfare benefits, and past & future distress.

WHEREFORE, Plaintiff JEFFERY HOOD moves for judgment in his favor and against Defendants [Koninklijke Philips N.V.; Philips North America LLC; Philips Holding USA, Inc.; and Philips RS North America LLC], in an amount exceeding $75,000.00, plus recoverable litigation/trial costs and expenses.

## COUNT II
### NEGLIGENCE (Manufacturing Defect; Design Defect; and Failing to Warn)

71.     In accordance with F.R.C.P. 10, Plaintiff restates paragraphs 1-63 as paragraph 71, and incorporates paragraphs 1-63 into paragraph 71.

72.     DEFENDANTS had a duty to research, develop, design, produce, manufacturer, sell, distribute, and market "the subject device" such that it was reasonably safe for all intended and foreseeable uses, and performed in the manner reasonably to be expected in light of its nature and intended function.

73.     DEFENDANTS had a nondelegable duty to warn prescribing physicians or other health professionals [who may prescribe "the subject device"] about potential adverse health effects related to "the subject device" of which DEFENDANTS knew or should have known.

74.     Regarding the duties outlined in paragraph 73, they continued subsequent to selling/distributing "the subject device".

15

75.     DEFENDANTS had a duty to warn of potential adverse health effects related to "the subject device" of which it knew or should have known.

76.     In order to ensure continual sales of its products, including "the subject device", DEFENDANTS voluntarily undertook a duty to monitor and discover potential adverse health effects relating to its products, including "the subject device", and then warn physicians, health professionals and users such as JEFFERY of any such potential health hazards.

77.     Regarding the duty outlined in paragraph 76, JEFFERY relied on such undertaking.

78.     DEFENDANTS had a duty to exercise ordinary care for Plaintiff's safety.

79.     DEFENDANTS negligently breached its duties because of at least one of the following:

    a    Manufactured, incorporated, and/or designed the PE-PUR foam in such manner to expose the user to the ingestion or inhalation of degraded PE-PUR foam particulates or chemical emissions.

    b    the PE-PUR foam incorporated in the devices may break down and release toxic particles or chemical emissions into a device's air pathway, which a person may ingest or inhale.

    c    The PE-PUR foam comprising part of the devices can degrade into particles that enter the devices' air pathway and can off-gas certain chemicals.

    d    The PE-PUR foam contains harmful chemicals including Toluene Diamine, Toluene Diisocyanate, and Diethylene Glycol.

    e    Manufactured and/or designed "the subject device" in such manner that it proximately causes potentially hazardous black debris/particles within the airpath circuits of its devices.

    f    The PE-PUR foam degradation is proximately caused or exacerbated by environmental factors such as heat, humidity, or moisture, which will foreseeably and/or inevitably occur at some point during ordinary use of the product.

16

g   Manufactured and/or designed "the subject device" in such manner that forced air must be passed-through potentially degraded PE-PUR foam before it is pumped into the patient's airway, thus exposing users to potential toxins.

h   Failed to utilize polyether urethane (PEUR) or silicone-based foam.

i   Manufactured and/or designed "the subject device" in such manner that the PE-PUR foam degradation is proximately caused or exacerbated by a process called hydrolysis (i.e. reaction with water), which potentially occurs during ordinary use (lifetime) of the product.

j   Failed to properly warn of the potential adverse health effects outlined herein, despite knowing (or should have known) of such.

k   Failed to properly warn of the potential adverse health effects resulting from exposure to degraded PE-PUR foam, its particulates and chemical emissions as a result of using "the subject device", when it knew or should have known of such potential hazards.

l   Failed to properly warn physicians or other professionals of the potential adverse effects outlined herein when it knew (or should have known) of such.

80.    Regarding the conditions outlined above, Defendant knew (*and by the beginning of 2011 should have known*) of such.

81.    As a proximate result of DEFENDANTS' negligence, outlined above, Plaintiff sustained serious and permanent injuries, including cancer, and as a further proximate result incurred economic and non-economic damages, including past & future pain & suffering, past & future disfigurement, past & future disability, past & future loss of normal life, past & future loss of earnings (*loss of earnings opportunities & potential*), past & future loss of health/welfare benefits, and past & future distress.

WHEREFORE, Plaintiff JEFFERY HOOD moves for judgment in his favor and against Defendants [Koninklijke Philips N.V.; Philips North America LLC; Philips Holding USA, Inc.; and Philips RS North America LLC], in an amount exceeding $75,000.00, plus recoverable litigation/trial costs and expenses.

17

## COUNT III
### *Willful & Wanton*

82.    In accordance with F.R.C.P. 10, Plaintiffs restate paragraphs 1-63 and 72-78 as

paragraph 82, and incorporate paragraphs 1-63 and 72-78 into paragraph 82.

83.    DEFENDANTS had duties to refrain from willful and wanton conduct

endangering the safety of Plaintiff.

84.    DEFENDANTS willfully and wantonly breached its duties because of at least one

of the following:

a    Manufactured, incorporated, and/or designed the PE-PUR foam in such manner to expose the user to the ingestion or inhalation of degraded PE-PUR foam particulates or chemical emissions.

b    the PE-PUR foam incorporated in the devices may break down and release toxic particles or chemical emissions into a device's air pathway, which a person may ingest or inhale.

c    The PE-PUR foam comprising part of the devices can degrade into particles that enter the devices' air pathway and can off-gas certain chemicals.

d    The PE-PUR foam contains harmful chemicals including Toluene Diamine, Toluene Diisocyanate, and Diethylene Glycol.

e    Manufactured and/or designed "the subject device" in such manner that it proximately causes potentially hazardous black debris/particles within the airpath circuits of its devices.

f    The PE-PUR foam degradation is proximately caused or exacerbated by environmental factors such as heat, humidity, or moisture, which will foreseeably and/or inevitably occur at some point during ordinary use of the product.

g    Manufactured and/or designed "the subject device" in such manner that forced air must be passed-through potentially degraded PE-PUR foam before it is pumped into the patient's airway, thus exposing users to potential toxins.

h    Failed to utilize polyether urethane (PEUR) or silicone-based foam.

    i   Manufactured and/or designed "the subject device" in such manner that the PE-PUR foam degradation is proximately caused or exacerbated by a process called hydrolysis (i.e. reaction with water), which potentially occurs during ordinary use (lifetime) of the product.

    j   Failed to properly warn of the potential adverse health effects outlined herein, despite knowing (or should have known) of such.

    k   Failed to properly warn of the potential adverse health effects resulting from exposure to degraded PE-PUR foam, its particulates and chemical emissions as a result of using "the subject device", when it knew or should have known of such potential hazards.

    m   Failed to properly warn physicians or other professionals of the potential adverse effects outlined herein when it knew (or should have known) of such.

85.    Regarding the conditions outlined in paragraph 84, Defendant knew (*and by the beginning of 2011 should have known*) of such.

86.    Regarding the acts or omissions outlined in paragraph 84, they were done with utter indifference to or conscious disregard for JEFFERY's safety and well-being.

87.    Plaintiff reserves the right to seek punitive damages in accordance with 735 ILCS 5/2-604.1.

88.    As a proximate result of DEFENDANTS' willful & wanton misconduct outlined above, Plaintiff sustained serious and permanent injuries, including cancer, and as a further proximate result incurred economic and non-economic damages, including past & future pain & suffering, past & future disfigurement, past & future disability, past & future loss of normal life, past & future loss of earnings (*loss of earnings opportunities & potential*), past & future loss of health/welfare benefits, and past & future distress.

WHEREFORE, Plaintiff JEFFERY HOOD moves for judgment in his favor and against Defendants [Koninklijke Philips N.V.; Philips North America LLC; Philips Holding USA, Inc.;

and Philips RS North America LLC], in an amount exceeding $75,000.00, plus recoverable litigation/trial costs and expenses.

## COUNT IV
### *Breach of Warranties (810 ILCS 5/2-314; 2-315; 2-318)*

89.     In accordance with F.R.C.P. 10, Plaintiffs restate paragraphs 1-88 as paragraph 89, and incorporate paragraphs 1-88 into paragraph 89.

90.     At all relevant times, and regarding "the subject device", PHILIPS intended it be used in the manner JEFFREY used it; expressly warranted it was safe and fit for use by JEFFREY; expressly warranted it was of merchantable quality; expressly warranted it was adequately tested and fit for its intended use; expressly warranted it was free of potential adverse health effects.

91.     PHILIPS knew of the intended use of "the subject device" at the time it researched, developed, designed, manufactured, sold, distributed, and marketed it; thus, PHILIPS impliedly warranted "the subject device" to be of merchantable quality and safe and fit for its ordinary and intended use.

92.     At all relevant times, PHILIPS knew that consumers, including JEFFREY, would use the recalled devices, including "the subject device", and thus, they are in privity with PHILIPS.

93.     "The subject device" was expected to, and did, reach JEFFREY without substantial change in its condition from that existing at the time of manufacture/sale by PHILIPS.

94.     At the point of sale, "the subject device", while appearing normal, contained immediate latent defects as set forth herein, rendering them unsuitable and unsafe for personal use by humans.

95.    In reliance upon PHILIPS' warranties, JEFFREY used "the subject device" as prescribed and directed, and therefore, in the foreseeable manner normally intended, recommended, promoted, and marketed by PHILIPS.

96.    At the time of making its warranties, PHILIPS knew (*and by the beginning of 2011 should have known*) that "the subject device" was not safe and had numerous defects, many of which PHILIPS did not accurately warn about, thus making "the subject device" unreasonably unsafe for its intended purpose.

97.    Members of the medical community, including physicians and other health care providers, as well as JEFFREY (*and his physicians and health care providers*), relied upon the representations and warranties of PHILIPS in connection with the use, recommendation, description, or prescribing of "the subject device".

98.    JEFFREY reasonably expected that, at the time of purchase, "the subject device" was safe for its ordinary & intended use, and free of potential adverse health effects.

99.    Had JEFFREY known "the subject device" was unsafe for use and/or was not free of potential adverse health effects, he would not have purchased or used it.

100.    PHILIPS breached its warranties upon the sale and distribution of "the subject device".

101.    PHILIPS breached its warranties to JEFFREY in that "the subject device" was not of merchantable quality; was unsafe; was unfit for its intended uses; and was not adequately tested.

102.    PHILIPS breached its warranties to JEFFREY in violation of applicable state statutes and common law, by manufacturing, marketing, and selling "the subject device" to JEFFREY and causing damages.

103.    PHILIPS' representations and implied warranties were false, misleading, and inaccurate because "the subject device" was defective, and not of merchantable quality.

21

104.     As a proximate result of PHILIPS' breaches of warranty, JEFFREY sustained serious and permanent injuries, including cancer, and as a further proximate result incurred economic and non-economic damages, including past & future pain & suffering, past & future disfigurement, past & future disability, past & future loss of normal life, past & future loss of earnings (*loss of earnings opportunities & potential*), past & future loss of health/welfare benefits, and past & future distress.

105.     PHILIPS knew of the adverse health effects to users of its unreasonably dangerous devices, including 'the subject device", but deliberately concealed such information and continued manufacturing, selling, and distributing the devices in order to maximize profits, thereby consciously disregarding the safety of users such as JEFFREY.  For those reasons and all others outlined in this Complaint, punitive damages are warranted.

WHEREFORE, Plaintiff JEFFERY HOOD moves for judgment in his favor and against Defendants [Koninklijke Philips N.V.; Philips North America LLC; Philips Holding USA, Inc.; and Philips RS North America LLC], in an amount exceeding $75,000.00, plus recoverable litigation/trial costs and expenses.  Plaintiff also seeks punitive damages against these same Defendants.

## COUNT V
### *ICFDPA (815 ILCS 505/1)*

106.     In accordance with F.R.C.P. 10, Plaintiff restates paragraphs 1-105 as paragraph 106, and incorporates paragraphs 1-105 into paragraph 106.

107.     Regarding DEFENDANTS' deceptive & fraudulent acts/practices outlined paragraphs 1-106, including those relating to "the subject device", they occurred in the course of conduct involving trade or commerce.

108.     At the time of selling "the subject device" to JEFFREY and subsequent thereto,

DEFENDANTS knowingly made false, deceptive, and misleading statements about "the subject

device", including that it is safe for use; that it was adequately tested; and that it is free of

potential adverse health effects.

109.     At the time of selling "the subject device" to JEFFREY and subsequent thereto,

DEFENDANTS deliberately concealed information about potential adverse health effects related

to "the subject device", including those outlined in paragraphs 1-108.

110.     Regarding DEFENDANTS' deceptive & fraudulent acts/practices outlined in

paragraphs 1-109, including those relating to "the subject device", they were deliberately done to

ensure continued sales and use of PHILIPS' products.

111.     Regarding DEFENDANTS' deceptive & fraudulent acts/practices outlined in

paragraphs 1-110, including those relating to "the subject device", they were deliberately done to

assure prescribing physicians and healthcare providers that PHILIPS "Sleep & Respiratory Care"

devices, including "the subject device", were safe and free of potential health hazards, so that

physicians and healthcare providers would continue prescribing the devices and would not have

discussions with patients about potential health hazards, and would not suggest cease using the

devices.

112.     Regarding DEFENDANTS' deceptive & fraudulent acts/practices outlined in

paragraphs 1-111, they were deliberately done to assure JEFFERY that "the subject device" was

safe for its ordinary & intended use, and free of potential adverse health effects.

113.     Had JEFFREY known "the subject device" was unsafe for use and/or was not free

of potential adverse health effects, he would not have purchased or used it.

114.    Regarding DEFENDANTS' deceptive & fraudulent acts/practices outlined in paragraphs 1-113, including those relating to "the subject device", DEFENDANTS intended that JEFFREY rely on such.

115.    Regarding DEFENDANTS' deceptive & fraudulent acts/practices outlined in paragraphs 1-114, including those relating to "the subject device", DEFENDANTS intended that physicians and health care providers rely on such.

116.    As a proximate result of DEFENDANTS' deceptive & fraudulent acts/practices outlined in paragraphs 1-115, including those relating to "the subject device", JEFFERY purchased "the subject device"; continued using "the subject device"; and was prevented from discovering the potential adverse health effects related to "the subject device", and as a further proximate result, JEFFREY sustained serious and permanent injuries, including cancer, and as a further proximate result incurred economic and non-economic damages, including past & future pain & suffering, past & future disfigurement, past & future disability, past & future loss of normal life, past & future loss of earnings (*loss of earnings opportunities & potential*), past & future loss of health/welfare benefits, and past & future distress.

117.    In accordance with F.R.C.P. 10, Plaintiff restates paragraphs 105 as paragraph 117, and incorporates paragraphs 105 into paragraph 117.

WHEREFORE, Plaintiff JEFFERY HOOD moves for judgment in his favor and against Defendants [Koninklijke Philips N.V.; Philips North America LLC; Philips Holding USA, Inc.; and Philips RS North America LLC], in an amount exceeding $75,000.00, plus recoverable litigation/trial costs and expenses.  Plaintiff also seeks punitive damages against these same Defendants.

**COUNT VI**

24

*Common Law Fraud*

118.    In accordance with F.R.C.P. 10, Plaintiff restates paragraphs 1-117 as paragraph 118, and incorporates paragraphs 1-117 into paragraph 118.

119.    At the time of selling "the subject device" to JEFFREY and subsequent thereto, DEFENDANTS knowingly made false statements about "the subject device", including that it is safe for use; that it was adequately tested; and that it is free of potential adverse health effects.

120.    At all times it made the statements outlined in paragraph 119, DEFENDANTS knew those statements were false.

121.    At all times it made the knowingly false statements outlined in paragraph 119, DEFENDANTS deliberately did so to assure JEFFERY that "the subject device" was safe for its ordinary & intended use, and free of potential adverse health effects.

122.    Regarding DEFENDANTS' statements outlined in paragraph 119, JEFFERY relied on such.

123.    At all times it made the knowingly false statements outlined in paragraph 119, DEFENDANTS deliberately did so to assure prescribing physicians and healthcare providers that PHILIPS "Sleep & Respiratory Care" devices, including "the subject device", were safe and free of potential health hazards, so that physicians and healthcare providers would continue prescribing the devices and would not have discussions with patients about potential health hazards, and would not suggest cease using the devices.

124.    Had JEFFREY known "the subject device" was unsafe for use and/or was not free of potential adverse health effects, he would not have purchased or used it.

125.    As a proximate result of DEFENDANTS' fraud and false statements outlined herein, JEFFERY purchased "the subject device"; continued using "the subject device"; and was

prevented from discovering the potential adverse health effects related to "the subject device", and as a further proximate result, JEFFREY sustained serious and permanent injuries, including cancer, and as a further proximate result incurred economic and non-economic damages, including past & future pain & suffering, past & future disfigurement, past & future disability, past & future loss of normal life, past & future loss of earnings (*loss of earnings opportunities & potential*), past & future loss of health/welfare benefits, and past & future distress.

126.    In accordance with F.R.C.P. 10, Plaintiff restates paragraphs 105 as paragraph 126, and incorporates paragraphs 105 into paragraph 126.

WHEREFORE, Plaintiff JEFFERY HOOD moves for judgment in his favor and against Defendants [Koninklijke Philips N.V.; Philips North America LLC; Philips Holding USA, Inc.; and Philips RS North America LLC], in an amount exceeding $75,000.00, plus recoverable litigation/trial costs and expenses. Plaintiff also seeks punitive damages against these same Defendants.

Respectfully submitted,
WHITESIDE & GOLDBERG
Attorneys for Plaintiff

BRYAN J. O'CONNOR #6285062

WHITESIDE & GOLDBERG, LTD.
155 N. Michigan Ave., Suite 540, Chicago, IL 60601
312-334-6875 (ph) / 800-334-6034 (fax)
boconnor@wglwgroup.com